## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KIMBERLY SHAW,** | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 3:18-cv-00067 (VLB)** |
| | **:** | |
| **YALE NEW HAVEN HOSPITAL,** | **:** | **April 21, 2020** |
| **Defendant.** | | |

### MEMORANDUM OF DECISION GRANTING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF No. 77]

This employment discrimination action was commenced by the Plaintiff, Kimberly Shaw, on January 11, 2018.  The Plaintiff is a former employee of the Defendant, Yale New Haven Hospital.  Plaintiff resigned from Defendant's employ in June 2016, and Defendant refused, as discussed in more detail *infra*, to grant Plaintiff's request to rescind her resignation.  Plaintiff alleges that Defendant's refusal to grant rescission of her resignation was motivated by racial animus and in retaliation for her complaints about Defendant's conduct in violation of Title VII of the Civil Rights Act of 1964 codified as 42 U.S.C. 2000e, *et al.* ("Title VII") and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. 46a-60, *et seq.*, as well as disability discrimination in violation of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), codified as amended at 42 U.S.C. § 12101 *et seq.*, and Connecticut state law.[1]

---

[1] Plaintiff was represented by counsel upon filing her Complaint.  [ECF No. 1]. However, on July 19, 2019, the Court granted Plaintiff's Counsel's Motion to Withdraw, [ECF No. 69]; Plaintiff opposes Defendant's Motion for Summary Judgment *pro se.*

On October 4, 2019, Defendant filed a motion for summary judgment and memorandum thereto on all claims in the complaint.  [ECF No. 77].  For the following reasons, the Defendant's motion for summary judgment is GRANTED.

## I. MATERIAL FACTS

The Court draws the following facts from the Defendant's Local Rule 56(a)1 Statement of Material Facts ("Def.'s Stmt."), [ECF No. 77-4], and the evidence in the record.[2]

Plaintiff began working for Defendant in March 2009 as a Surgical Technician.  [ECF No. 1 ¶ 13]; Def.'s Stmt. ¶ 1.

On February 16, 2016, Plaintiff assisted with a coronary artery bypass graft ("CABG") procedure conducted by a medical resident named Dr. Mohammed Anwar (who Plaintiff identified as "Middle Eastern"), and supervised by an

---

[2] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."  Defendant informed Plaintiff of these requirements in its *Notice to Pro Se Litigant*, [ECF No. 79], but Plaintiff, despite filing an Opposition and an Amended Opposition to Defendant's Motion for Summary Judgment, [ECF Nos. 80, 81], did not provide a Rule 56(a)2 statement in response.  In addition to deeming admitted uncontroverted facts, the Court may, for a violation of Local Rule 56(a)(3), "impos[e] sanctions, including, when the opponent [to a Motion for Summary Judgment] fails to comply, an order granting the motion [for summary judgment] if the motion and supporting materials show that the movant is entitled to judgment as a matter of law."  D. Conn. L. Civ. R. 56(a)(3).

2

attending physician, Dr. Bonde (who Plaintiff identified as "Indian," and as having an "Indian accent"). [ECF No. 1 ¶ 15]; Def.'s Stmt. ¶ 2; Deposition Transcript of Kimberly Shaw ("Shaw Depo. Tr.") at 41, 50.

There were several other individuals in the operating room ("OR") during the coronary artery bypass graft procedure, including, but not limited to, Physician's Assistant Judith Farkas, Registered Nurse Sean McLaughlin, and Surgical Technician Jason Ponte. Def.'s Stmt. ¶ 3; Shaw Depo. Tr. at 41.

During the course of the procedure, Dr. Anwar requested several times that he be provided with a "liga." "Liga" or "ligaclip" are alternate terms for a medical device also known as a "hemoclip" that was being used in the surgical procedure. [ECF No. 1 ¶ 15]; Def.'s Stmt. ¶ 4; Shaw Depo. Tr. at 41, 43. This was not the first time that Plaintiff had heard a hemoclip being referred to as a "liga." Plaintiff had also heard the attending physician on February 16, 2016, Dr. Bonde, use the term "liga" on several other prior occasions. Def.'s Stmt. ¶ 5; Shaw Depo. Tr. at 42-43.

Once during the subject coronary artery bypass graft procedure when Dr. Anwar requested a "liga," Ms. Farkas commented to Plaintiff "I was kind of wondering what he was saying"[3] and "I thought he was saying something else."

---

[3] During her deposition, Plaintiff testified that Physician's Assistant Farkas said during the procedure "I was kind of wondering what he was saying" and separately "I thought he was saying something else." Shaw Depo. Tr. at 43-44. In an email Plaintiff sent to her supervisor, Anne Turner, the night of the incident at

After her initial confusion, she deduced Dr. Anwar was requesting a hemoclip. Def.'s Stmt. ¶ 6; Shaw Depo. Tr. at 43-44, 68, 79; Shaw Depo. Exh. 11.

Plaintiff testified that Physician's Assistant Farkas' comments sparked a conversation among others who were standing in the corner of the room. Dr. Bonde, Mr. McLaughlin, and Mr. Ponte began discussing a prior incident involving a former African-American surgical technician, Greg Gatlean. On that prior occasion, Mr. Gatlean had been offended when Dr. Bonde asked him for a "liga," mistakenly believing that Dr. Bonde had used the N-word. Def.'s Stmt. ¶ 8; Shaw Depo. Tr. at 44-45, 48-49, 68; Shaw Depo. Exh. 11.

While discussing the prior misunderstanding involving Mr. Gatlean, Dr. Bonde "blurted out" or "yelled" the word "nigga" or "nigger," referring to what Mr. Gatlean mistakenly believed Dr. Bonde had said in the prior incident. Def.'s Stmt. ¶ 8; Shaw Depo. Tr. at 44-45, 53-54, 67-68, 73-74; Shaw Depo. Exh. 11. Immediately after Dr. Bonde said the derogatory term, he covered his mouth and demonstrated that he was remorseful for his mistake, but his mistake caused Mr. Ponte and Mr. McLaughlin to start laughing. Def.'s Stmt. ¶ 8; Shaw Depo. Tr. at 45-46; Shaw Depo. Exh. 11.

In response to the incident involving Dr. Bonde, Plaintiff requested that Dr. Anwar refrain from using the term "liga" as it pertained to the medical instrument

issue, Plaintiff wrote that Farkas said "Kim, I just figured out what he was saying. I thought he was saying something else." Shaw Deposition Exhibit ("Shaw Depo. Exh.") 11, [ECF No. 77-2 at 80-81].

4

"hemoclip," and stated—in reference to everyone in the OR—that "[w]e need to stop the inappropriate conversation."  Def.'s Stmt. ¶ 9; Shaw Depo. Tr. at 46-47, 68-69, 79-81; Shaw Depo. Exh. 11.  Dr. Anwar asked what he should call the device, and Plaintiff asked that he refer to it as a "hemoclip."  Dr. Anwar did not cease from saying "liga" following Plaintiff's comments, and he continued to operate on his patient.  Def.'s Stmt. ¶ 10; Shaw Depo. Tr. at 46-47, 54, 68-69; Shaw Depo. Exh. 11.

Plaintiff then requested to be excused from the procedure.  Dr. Bonde followed Plaintiff into the hallway and apologized for saying the N-word, acknowledging that he should not have said it.  Def.'s Stmt. ¶ 11; Shaw Depo. Tr. at 69-70; Shaw Depo. Exh. 11.

Once the surgery ultimately concluded, Plaintiff asked an unidentified male perfusionist—who was in the OR during the surgery—if he would be willing to be a "witness" on her behalf if necessary.  The perfusionist declined to commit to supporting Plaintiff, maintaining that he did not want to get involved.  Def.'s Stmt. ¶ 12; Shaw Depo. Tr. at 55-56, 61-62.

Later that evening, Plaintiff expressed her frustration about the incident to Glenda, the evening manager.[4]  Glenda had already heard about the incident and

---

[4] Glenda's last name is not apparent from the record.

told Plaintiff that she would follow up with Anne Turner, Patient Service Manager and Plaintiff's supervisor, about it.[5]  Def.'s Stmt. ¶ 13; Shaw Depo. Tr. at 40, 62-65.

Plaintiff emailed Ms. Turner later that night and described her account of the events that occurred in the OR.  About two hours after Plaintiff sent Ms. Turner the email, Turner replied, apologizing for what had occurred that day and promising to follow up in the morning.  Def.'s Stmt. ¶ 14; Shaw Depo. Tr. at 62, 65, 70; Shaw Depo. Exh. 11.

Two days later, on February 18, 2016, Plaintiff met with Ms. Turner and shared what had occurred in the OR on February 16.  Ms. Turner told Plaintiff that they were taking the matter "seriously," and that "upper management" would handle it.  Def.'s Stmt. ¶ 15; Shaw Depo. Tr. at 72-74.

On February 24, 2016, Plaintiff had a second meeting regarding the events in the OR with Ms. Turner and OR Director, Jane Wagner.  In the meeting, Plaintiff again summarized her thoughts about the February 16 incident, and disclosed to Turner and Wagner that she had seen a licensed social worker, Beverly Chevalier, for the alleged stress that she suffered from due to her job, and that she needed someone to vent to about stress at work.  After Ms. Wagner learned that Plaintiff had seen Chevalier, Wagner said to Plaintiff "I wonder if you're capable of

---

[5] Plaintiff was also supervised by Michelle Verderame.  Shaw Deposition Exhibit 21 ("Shaw Depo. Exh. 21"), [ECF No. 77-2 at 102].

mentally continuing to work here."   Plaintiff responded that she "could do her job."  Def.'s Stmt. ¶ 16; Shaw Depo. Tr. at 75, 82-86.

Plaintiff testified at her deposition that an unidentified surgeon told Plaintiff that she had "psychiatric -- psychological problems" on one occasion before the February 16, 2016 incident.  At an unspecified number of random occasions after the February 16 incident, other unidentified individuals allegedly used the terms "crazy" or "psycho" in reference to Plaintiff.  Def.'s Stmt. ¶ 17; Shaw Depo. Tr. at 86-87.

Plaintiff testified that after she complained about the OR incident, unidentified coworkers sporadically tampered with Plaintiff's locker a couple of times a week over the course of several weeks by prying open the upper portion of her locker, so that Plaintiff would return to her locker and find that portion open after being certain that she had closed it.  Sometimes some of Plaintiff's paperwork went missing from her locker, and Plaintiff testified that she believed her coworkers were playing "mind games" with her.  Def.'s Stmt. ¶¶ 18-19; Shaw Depo. Tr. at 88-91.

On April 14, 2016, Plaintiff sent an email to Yale Hospital supervisors Kevin Myatt and Lina Perrotti reporting that her coworkers were videotaping her at various times on the job and that this was confirmed by an unidentified medical student.  Def.'s Stmt. ¶ 20; Shaw Depo. Tr. at 92-93; Shaw Deposition Exhibit 13 ("Shaw Depo. Exh. 13"), [ECF No. 77-2 at 83].

On May 11, 2016, Plaintiff sent an email to Kevin Myatt claiming that she overheard "many references to physical harm which has increased my concern for my safety.  Even though I cannot include the names in this email, these references has [sic] come from various [staff] members that I work with."  Def.'s Stmt. ¶¶ 21-22; Shaw Depo. Tr. at 92-98; Shaw Deposition Exhibit 14 ("Shaw Depo. Exh. 14"), [ECF No. 77-2 at 84].  Mr. Myatt forwarded the email to Ms. Perrotti and asked her to investigate.  Shaw Depo. Exh. 14.  Plaintiff, during her deposition, identified a Dr. Elefteriades as one individual who said, "we're going to get her," but was unable to identify any other individuals.  Def.'s Stmt. ¶ 24; Shaw. Depo. Tr. at 95.

Plaintiff also believed that people at work knew what she had watched on television the day before and made references to what she had watched.  Def.'s Stmt. ¶ 23; Shaw Depo. Tr. at 94.  Plaintiff also contended, in the May 11, 2016 email to Mr. Myatt, that information pertaining to her home computer, emails, and phone were compromised, and that "various valuable account information, inventions, and financial information" of hers had been hacked.  Shaw Depo. Exh. 14.  Plaintiff concluded that her home computer had been hacked because she heard an individual she identified as "Dr. Dewar" recite lines from a poem that Plaintiff wrote about Trayvon Martin that she had not published or shared.  Def.'s Stmt. ¶ 25; Shaw Depo. Tr. at 95-96, 105; Shaw Depo. Exh. 14.  In the May 11, 2016

8

email to Mr. Myatt, Plaintiff requested to be transferred to a different Yale Hospital facility.  Shaw Depo. Exh. 14.

On May 12, 2016, Ms. Perrotti requested via email to meet with Plaintiff on May 16 to discuss the issues described in Plaintiff's May 11, 2016 email.  Shaw Deposition Exhibit 15 ("Shaw Depo. Exh. 15"), [ECF No. 77-2 at 85].  Plaintiff responded that she had just submitted a letter of resignation to her supervisor, Michelle Verderame.  Def.'s Stmt. ¶ 26; Shaw Depo. Exh. 15 (explaining that Plaintiff had "just submitted a letter of resignation to my supervisor, Michelle V.")[6]; Shaw Deposition Exhibit 16 ("Shaw Depo. Exh. 16") (May 12, 2016 Letter of Resignation effective June 10, 2016), [ECF No. 77-2 at 86].

Four days later, on May 16, 2016, Plaintiff attempted to rescind her resignation by way of a letter hand-delivered to her supervisor and an email to Ms. Perrotti.  Def.'s Stmt. ¶ 27; Shaw Depo. Tr. at 100; Shaw Deposition Exhibit 17 ("Shaw Depo. Exh. 17"), [ECF No. 77-2 at 87]; Shaw Deposition Exhibit 18) ("Shaw Depo. Exh. 18"), [ECF No. 77-2 at 88].  The letter stated that she was rescinding her resignation because of the job market, and Plaintiff testified that her initial efforts to find a new job suggested that she would have to take a pay cut or travel.  Def.'s Stmt. ¶ 27; Shaw Depo. Tr. at 101-02; Shaw Depo. Exh. 17.  Plaintiff also testified that part of the reason she wanted to rescind her resignation was because in the four days since she resigned, she "was able to speak to a lawyer

---

[6] A later email identified Plaintiff's supervisor that had received Plaintiff's

9

about me being harassed."   Shaw Depo. Tr. at 101-03; *see also* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp.") at 4 ("The plaintiff retained legal counsel and wanted to rescind her resignation . . . ."), [ECF No. 81 at 4].

Ms. Perrotti responded to Plaintiff's email on the same day, May 16, 2016, explaining to Plaintiff that because she had already resigned, whether she would be able to rescind her resignation would have to be presented to and decided by Plaintiff's former department.  Def.'s Stmt. ¶ 28; Shaw Depo. Exh. 18.

On May 17, 2016, Plaintiff met with Ms. Perrotti and Alex Reynolds, a senior employee relations specialist.   In that meeting, Plaintiff reported that multiple surgeons wanted to harm her and were threatening her, basing this belief on her perception of statements such as "take care of her" and because of "the entire conversation of them using personal -- using information to identify me."  Def.'s Stmt.  ¶ 29; Shaw Depo. Tr. at 97-98, 104-105; Defendant's Response to Plaintiff's CHRO Complaint ("CHRO Complaint") ¶ 17, [ECF No. 77-3 at 5-12].

As a result of Plaintiff's perception that statements such as "take care of her" were threats of physical harm, Perrotti and Reynolds became concerned, and requested that Plaintiff be assessed to establish her fitness for duty, making this a requirement for Plaintiff's return to work.   Def.'s Stmt. ¶¶ 30, 32; Shaw Depo. Tr. at 105-08; Shaw Depo. Exh. 21; CHRO Complaint ¶¶ 17, 21.

---

resignation letter as "Michelle Verderame."  Shaw Depo. Exh. 21.

Plaintiff was seen initially by Dr. Nicholas Browning from Defendant's Occupational Health Services, on May 18, 2016.  Based on this meeting, Dr. Browning would not clear Plaintiff to return to work until she first received a psychiatric evaluation.  Plaintiff selected her own psychiatrist, Dr. Derek Franklin, to perform that evaluation, which was completed on May 27, 2016.  Def.'s Stmt. ¶¶ 33-34; Shaw Depo. Tr. at 107-108, Shaw Depo. Exhs. 19, 21; CHRO Complaint ¶¶ 22-23; Dr. Franklin Evaluation dated May 27, 2016 ("Franklin Evaluation"), [ECF No. 77-3 at 14-21].

During Dr. Franklin's evaluation, Plaintiff told him that after the February 16, 2016 OR incident:

- "she was now hearing that surgeons were refusing to work with her and when she did work with them, she would hear them make comments, 'like murder, we need to put this one away, we should have gotten rid of this one a long time ago.'"

- "she believed that they were talking about her and she became increasingly frightened because, 'I felt they were playing mind games on me.'"

- she "became quite concerned about her surroundings, 'like when I went home one time, I saw someone outside my home sitting in a car and I was scared because I thought maybe they were there for me, because I've heard the doctors talk about the mafia.'"

Franklin Evaluation at 5.

In his report, Dr. Franklin diagnosed Plaintiff, per the DSM-5, with "Unspecified Mood Disorder with Anxious features" and "Paranoid Personality Traits" and determined that "it would be ill advised to return [Plaintiff] to the OR

without adequate reintegration and preferably not with the OR team that she last had problems with."  Dr. Franklin also reported that Plaintiff's "emotional lability, hyper-vigilance and poor reaction to psychosocial stressors suggest that she will likely require short-term intervention prior to returning to work."  Def.'s Stmt. ¶ 40; Shaw Depo. Tr. at 117; Franklin Evaluation at 6.

When Plaintiff saw Dr. Franklin on May 27. 2016, he informed her that he needed written authorization from Plaintiff to release his report to any other party. Franklin Evaluation at 1-2.  Although Plaintiff gave him oral permission to so release his report at that time, she did not sign a written release authorization of Dr. Franklin's report until June 22, 2016.  Pl.'s Opp. at 77.  On June 10, 2016, in a phone conversation with Dr. Browning, Plaintiff learned that Dr. Franklin and Dr. Browning had not been in touch.  Def.'s Stmt. ¶ 37; Shaw Depo. Tr. at 108-11; CHRO Complaint ¶ 23.

Mr. Reynolds thereafter sent Plaintiff a letter dated June 15, 2016, alerting Plaintiff that Dr. Browning had not yet received a report from Dr. Franklin, and therefore, Dr. Browning was unable to evaluate Plaintiff's ability to perform her job responsibilities.  Given the failure to provide the requested clearance by that time, Reynolds' letter also informed Plaintiff that Defendant accepted her resignation effective June 10, 2016 and invited her contact him by June 20 if that was not her intent.  Def.'s Stmt. ¶ 38; Shaw Depo. Tr. at 122, Shaw Depo. Exh. 21.

Plaintiff received the first copy of Dr. Franklin's evaluation prior to June 15, 2016.  Plaintiff emailed Dr. Franklin on June 15, 2016 and addressed some typographical and substantive errors contained in his report.  Def.'s Stmt. ¶ 39; Shaw Depo. Tr. at 119-22; Shaw Deposition Exhibit 23 ("Shaw Depo. Exh. 23"), [ECF No. 77-2 at 104-05].  Dr. Franklin made Plaintiff's suggested corrections, and mailed her a copy of the updated evaluation, which she received on or about June 20, 2016.  Def.'s Stmt. ¶ 39; Shaw Depo. Tr. at 119-22.  After Plaintiff signed the written authorization for Dr. Franklin to release his report to Defendant on June 22, 2016, Dr. Franklin sent his report to Dr. Browning the same day.  Pl.'s Opp. at 78.

Due to Dr. Franklin's conclusions, Plaintiff was not cleared to work at that time by Dr. Browning.  Def.'s Stmt. ¶ 41; Shaw Depo. Exh. 24.  Therefore, on June 22, 2016, Defendant decided to accept Plaintiff's resignation as originally submitted on May 12, 2016. Def.'s Stmt. ¶ 41; Shaw Depo. Tr. at 13, 122; Shaw Depo. Exh. 21; Franklin Report.

Plaintiff filed timely claims with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and with the Equal Employment Opportunity Commission ("EEOC").  Complaint ¶¶ 6, 7.  Plaintiff received a timely Release of Jurisdiction from the CHRO on October 13, 2017 and a timely Notice of Right to Sue from the EEOC on November 17, 2017.  Complaint ¶¶ 8, 9.

Plaintiff timely filed this Complaint on January 11, 2018.  [ECF No. 1].

## II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see also Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be

denied." ***Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH***, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." ***Gottlieb***, 84 F.3d at 518. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. ***Fincher v. Depository Trust & Clearing Corp.***, 604 F.3d 712, 726–27 (2d Cir. 2010).

### III.   DISCUSSION

#### A.   Race-Based Discriminatory Discharge Claims

Under Title VII, Plaintiff's claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 802 (1973). The ***McDonnell Douglas*** standard requires that Plaintiff establish a *prima facie* case of discrimination by showing that (1) she is part of a protected class; (2) that she was qualified for his position; (3) that she suffered an adverse employment action; and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination. *Id.* The Second Circuit has noted that the burden to establish a *prima facie* case

is "minimal" or "*de minimis.*"  *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

If Plaintiff can establish a *prima facie* case, the burden shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.  At this stage, Defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted).

If Defendant meets its burden of production, the burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination.  *McDonnell Douglas*, 411 U.S. at 804.  "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143.

Here, Plaintiff's *prima facie* case, despite requiring only a *de minimis* showing, founders on three of the four required grounds.

First, Plaintiff argues that she was qualified for her position: "The plaintiff was indeed qualified for her position.  The plaintiff joined the cardiac team at

YNHH in 2012."  Pl.'s Opp. at 8.  She also argues that she was qualified because Dr. Franklin's report actually cleared her to return to work: "The plaintiff was required to be fit for duty by Dr. Browning and her report showed that she was." *Id.* at 9.  Neither argument is persuasive.

The evidence of record shows that Plaintiff did not pass the fitness for duty examination Defendant ordered as a precondition to Plaintiff's return to work.  Dr. Franklin's report specifically stated that Plaintiff's "emotional lability, hyper-vigilance and poor reaction to psychosocial stressors suggest that she will likely require short-term intervention *prior to returning to work*."  Franklin Evaluation at 6 (emphasis added).  Dr. Browning, who was the party charged with determining Plaintiff's fitness for duty and who had required Dr. Franklin's psychiatric evaluation, found that Dr. Franklin's report meant Plaintiff was not fit for duty. Defs' Stmt. ¶ 41; Shaw Depo. Exh. 24.  Under such circumstances, courts have found plaintiffs unqualified for work under the second *McDonnell Douglas prima facie* case factor.  *Quaintance v. City of Columbia*, No. 2:17-cv-04007-NKL, 2018 U.S. Dist. LEXIS 42, at *8 (W.D. Mo. Jan. 2, 2018) ("Quaintance has not established a *prima facie* case because she has not shown that she was *qualified* to perform the 'essential functions' of the  job of temporary bus driver; namely, the ability to drive the bus safely.  It is undisputed that Quaintance was pulled from bus driving duty pending a fitness for duty examination, and that a medical examiner determined she was 'NOT medically capable of returning to the full

duties of the position.'") (emphasis in original).   Whether Plaintiff had been working as a qualified surgical technician since 2012 is irrelevant to the question of whether she was qualified to work at the time Drs. Franklin and Browning made their decisions that she was not.

In addition to not being qualified to return to work, Plaintiff did not suffer an adverse employment action.   It is undisputed that Plaintiff resigned from her surgical technician position.   Defs.' Stmt. ¶ 26; Shaw Depo. Exh. 15 (explaining that Plaintiff had "just submitted a letter of resignation to my supervisor, Michelle V.")[7]; Shaw Depo. Exh. 16 (May 12, 2016 Letter of Resignation effective June 10, 2016).

Defendant's acceptance of Plaintiff's resignation was not an adverse employment action as a matter of law, as numerous courts in this Circuit have held. *Salen v. Blackburn Bldg. Servs., LLC*, No. 3:14-CV-01361 (VAB), 2017 WL 71708, at *16 (D. Conn. Jan. 6, 2017) ("While a defendant's termination of an employee would constitute an 'adverse employment action,' a defendant's termination of an employee who has resigned does not.") (quoting *Davis v. Koffee Kup Bakery, Inc.*, No. 2:15-cv-152 (CR), 2016 WL 4411399, at *6 (D. Vt. Aug. 18, 2016); *Davis*, 2016 WL 4411399, at *6 ("Where an employee voluntarily quits, there is no adverse employment action.") (citation omitted); *see also Cadet v. Deutsche Bank Sec. Inc.*, No. 11 Civ. 7964 (CM), 2013 WL 3090690, at *11 (S.D.N.Y.

---

[7] A later email identified Plaintiff's supervisor that had received Plaintiff's

18

June 18, 2013) ("A voluntary resignation does not constitute an adverse employment action.").

Nor does Defendant's refusal to rescind Plaintiff's voluntary employment resignation constitute an adverse employment action.  *See Cadet*, 2016 WL 3090690, at *13 ("[f]ederal courts across the country have held that 'the refusal to allow rescission of a voluntary resignation does not constitute an adverse action.' … The reason for this is simple: employers are not usually obligated to allow their employees to rescind their resignations.") (quoting *Hammonds v. Hyundai Motor Mfg. Alabama, LLC*, No. 2:10-CV-103, 2011 WL 2580168, at *4 (M.D. Ala. June 28, 2011) (citing cases); *Hammonds*, 2011 WL 2580168, at *4 ("[I]n the absence of a duty to permit an employee to rescind [her] resignation, it is not an adverse employment action—for the purposes of a discrimination claim or a retaliation claim—for an employer to take the employee at [her] word that [she] wants out and not reinstate [her] if [she] changes [her] mind.").  Here, Plaintiff does not argue that Defendant had a duty, contractual or otherwise, to accept Plaintiff's attempted rescission of her resignation.

In sum, neither Plaintiff's voluntary resignation from Defendant's employment nor Defendant's refusal to reinstate Plaintiff constitute adverse employment actions.

resignation letter as "Michelle Verderame."  Shaw Depo. Exh. 21.

The Court pauses briefly to note that while a resignation *can* constitute an adverse employment action where the Plaintiff was coerced into resigning, *Cadet*, 2016 WL 4411399, at *11, *i.e.*, a so-called "constructive discharge," Plaintiff does even allege, much less argue, that such coercion occurred here. And, the record shows that the only remark of a racial nature was made by Dr. Bonde. Defendant investigated Plaintiff's complaint about this remark, and Dr. Bonde was required to undergo sensitivity training, which he completed. Plaintiff made other complaints of a more banal nature, but these remarks and acts were not clearly threatening or racial and were not extreme. The employer took them seriously and was in the early stage of investigating them when Plaintiff resigned. Thus, neither the severity nor the knowledge/neglect elements of constructive discharge exist.

Finally, as regards Plaintiff's *prima facie* racial discrimination case, Plaintiff has failed to adduce any evidence tying Defendant's refusal to rescind Plaintiff's voluntary resignation to any racial animus on the part of Defendant's decision makers.

"[A]n individual plaintiff may establish a prima facie case by 'showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under' Title VII." *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 218 (2015) (quoting *Furnco Constr. Corp.* v. *Waters*, 438 U. S.

567, 576 (1978)).  "[A] showing of disparate treatment 'is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case.'  Raising such an inference, however, requires the plaintiff to show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group. . . . A similarly situated employee is one 'similarly situated in all material respects' to the plaintiff."  *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014); *Lu v. Chase Investment Servs. Corp.*, 412 F. App'x 413, 418 (2d Cir. 2011) (finding no disparate treatment where plaintiff failed to identify comparator who committed similar infraction but was not disciplined).

Here, Plaintiff has not alleged and does not argue that there were non-African-American "similarly situated employees" who were treated more favorably than her, by, for example, allowing them to rescind their resignations or by not requiring fitness for duty examinations circumstances similar to Plaintiff's.

In the absence of evidence portraying a disparity in treatment as between Plaintiff and one or more similarly situated employees outside her protected class, "[a]n inference of discriminatory intent may be established by, *inter alia*, the employer's invidious comments about others in the employee's protected group; or the sequence of events leading to the plaintiff's discharge."  *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009).

21

In determining whether an utterance of a racial nature is probative of discriminatory intent with respect to a challenged adverse employment action, courts look to the following factors: "(1) who made the remark (i.e., a decisionmaker, a supervisor, or a low-level coworker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made, (i.e. whether it was related to the decisionmaking process)." *Vogel v. CA, Inc.*, 44 F. Supp. 3d 207, 223 (D. Conn. 2014) (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)), *aff'd* 662 F. App'x 72 (2016). "Generally, 'remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by discrimination.'" *Vale v. City of New Haven*, 197 F. Supp. 3d 389, 400 (D. Conn. 2016) (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)). And "'[t]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'" *Tolbert v. Smith*, 790 F.3d 427, 437 (2d Cir. 2015).

Here, Plaintiff's sole allegation as regards employer "invidious comments" involves Dr. Bonde's use of the N-word during the February 16, 2016 operation. But Dr. Bonde's "comment" is not imputable to the decision-makers who refused to rescind Plaintiff's voluntary resignation. Dr. Bonde was not even an employee

of Defendant's, CHRO Complaint ¶ 30 (explaining Dr. Bonde was "a Yale Medical School employee who ha[d] surgical privileges at Yale-New Haven Hospital."), and certainly had no decision-making authority as regards Plaintiff's continued employment.

Racially imbued "comments by non-decision makers, without more, are not evidence that can raise an inference of discrimination and defeat summary judgment." *Saliga v. Chemtura Corp.*, No. 3:12-cv-832, 2015 WL 5797000, at *8 (D. Conn. Sept. 30, 2015); *see also Greenfield v. McDonald's Corp.*, No. 3:10-cv-40, 2011 WL 3859717, at *6 (D. Conn. Sept. 1, 2011) (allegation that coworker called plaintiff N-word during an altercation "cannot constitute evidence of discrimination on the part of the Defendant" where co-worker had "no input on . . . decision to terminate Plaintiff's employment"); *Coltin v. Corporation for Justice Mgmt., Inc.*, 542 F. Supp. 2d 197, 205 (D. Conn. 2008) (discriminatory remarks by non-decision-maker insufficient to sustain Title VII claim).

That being so, and given the absence of evidence that Defendant treated Plaintiff less favorably than similarly situated employees outside her protected class, as well as Plaintiff neither being cleared to return to work, nor suffering an adverse employment action, Plaintiff is incapable of proving a *prima facie* case for race-based discriminatory discharge under Title VII (Count One) or the CFEPA (Count Two).

23

**B.      Disability-Based Discriminatory Discharge Claims**

To state a *prima facie* case of disability discrimination under the ADA and the CFEPA, Plaintiff must show: "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015), *see also Eaddy v. City of Bridgeport*, 156 Conn. App. 597, 603-604 (2015) (*prima facie* elements under CFEPA).

First, as discussed, *supra*, Plaintiff was not cleared to return to work following her fitness for duty examination, meaning she was not "qualified" to perform her job under the requirements for establishing a *prima facie* case. Second, Plaintiff did not suffer an adverse employment action as a matter of law.

In addition, to be "regarded as having . . . an impairment," an individual must "establish[ ] that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 524 (S.D.N.Y. 2018), *aff'd*, 768 F. App'x 139 (2d Cir. 2019); *see also Eaddy*, 156 Conn. App. at 598 (under CFEPA, "[i]n order for an individual to prove that he or she has been

24

the object of discrimination because of a perceived mental disability, the person must first show that he or she in fact has been perceived to have a recognized mental disorder").

Plaintiff testified that Defendant perceived her as mentally disabled as evidenced by her being required to undergo a fitness for duty examination.  Shaw Depo. Tr. at 127.  But "[c]ourts have repeatedly held that requiring mental and physical examinations to determine fitness for duty are not enough to suggest that an employee is regarded as mentally disabled."  *Graham v. Boehringer Ingelheim Pharm., Inc.*, 451 F. Supp. 2d 360, 372 (D. Conn. 2006) (granting summary judgment to employer on perceived disability claim for want of evidence that employer "regarded" plaintiff has having a mental disability after he was sent for a fit for duty exam after an alleged threat of violence in the workplace); *see also Ford v. New York City Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 395 (S.D.N.Y. 2008), *aff'd* 352 F. App'x 471 (2d Cir. 2009) (granting employer summary judgment on ADA claim and noting "[t]he Second Circuit has specifically held that requiring an employee to undergo an evaluation does not evidence discrimination.").  "A request for a medical examination is 'not equivalent to treatment of the employee as though [she] were substantially impaired.  Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims.'"  *Pierce v. Highland Falls-Fort Montgomery Cent. Sch. Dist.*, No. 08-CIV-1948 RKE,

2011 WL 4526520, at *10 (S.D.N.Y. Sept. 28, 2011), quoting *Doe v. Bd. of Educ.*, 63 F. App'x 46, 49 (2d Cir. 2003).  Plaintiff's claims regarding Defendant's employees videotaping her, hacking her computer and stealing her "inventions," quoting poetry she had written but not shared with anyone, etc., prompted safety concerns as to whether she posed a threat to herself, and whether she was capable of performing her duties in the high-stress situation of an operating room.  Thus, "[a]t most such evidence suggests that [Defendant] regarded [Plaintiff's] mental condition as an open question that required assessment by a professional."  *Graham*, 451 F. Supp. 2d at 372.

In sum, Plaintiff fails to establish that she has met the requirements for a *prima facie* case of discrimination based on a mental disability.

C.     Retaliation

To establish a *prima facie* case of retaliation under the ADA, Title VII, and/or CFEPA, a plaintiff must provide evidence of "(i) conduct by the plaintiff that is protected activity; (ii) of which the employer was aware; (iii) followed by an adverse employment action; (iv) that was causally connected to the protected activity."  *Rakowsky v. Nielsen*, 744 F. App'x 743, 744 (2d Cir. 2018) (Title VII); *see also Francis v. Hartford Bd. of Educ.*, No. 3:14-cv-972, 2017 WL 4401452, at *4 (D. Conn. Sept. 30, 2017) (reciting same *prima facie* proof requirements in context of ADA and CFEPA retaliation case).

As with her discrimination claims, Plaintiff fails to argue a *prima facie* case for retaliation, for several reasons.  First, Plaintiff was not engaged in a protected activity under the federal discrimination laws because the subject of Plaintiff's complaint, the racial slur uttered by Dr. Bonde during the February 16, 2016 surgery, was not actionable as a Title VII violation.  It obviously had nothing to do with Plaintiff's disability claim, and, as discussed, *supra*, a racial slur uttered by a non-employee cannot be imputed to the employer as a Title VII violation.  Simply put, Dr. Bonde's behavior did not by itself constitute a Title VII or ADA violation; therefore, Plaintiff complaining about it was not a "protected activity."  Therefore, Plaintiff's *prima facie* retaliation case fails.

Second, as discussed, Plaintiff was not subject to an adverse employment action in that she voluntarily resigned.

Third, Plaintiff's *prima facie* retaliation claim fails because Plaintiff has failed to adduce any evidence that Defendant retaliated against her.  Defendant argues that it "responded to Plaintiff's lone complaint about the February 16 procedure not just with a sympathetic ear but in a substantive and aggressive way by immediately launching an investigation and implementing effective remedial measures:

- When Plaintiff first told her immediate supervisor, the supervisor said she would escalate it to her own superior.  (Shaw Dep. at 63).
- When Plaintiff emailed Turner to summarize what occurred that evening, Turner replied within hours to say "I'm so sorry you had to be subjected to that. I will follow up in the morning.  (Shaw Dep., Exh. 11)

**27**

- **Within two days of the complaint, Plaintiff had a meeting with Turner[,] (Shaw Dep. at 72-74), and a second meeting with Turner and Wagner. (Shaw Dep. at 82-86)**
- **The matter was investigated, and Dr. Bonde participated in sensitivity training.  (Shaw Dep. at 122, Exh. 12; Exh. A to Wright Aff., ¶¶ 8-10, 30).**

**This response on the part of YNHH simply cannot be squared with the notion that YNHH lashed out against Plaintiff months later, particularly given Plaintiff tendered her resignation within days of a request to meet regarding her then latest complaint."  [ECF No. 77-1 at 30-31].  The Court agrees.  Here, there was simply no retaliation.  Rather, there was a concerted and persistent effort on Defendant's part to investigate and correct, to the extent it could, any deficiencies in conduct on the part of those manning Defendant's facilities.**

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment [ECF No. 77].  The clerk is instructed to close this case and enter judgment in Defendant's favor.

_____/s/_____
**Vanessa L. Bryant**
**United States District Judge**

**SO ORDERED at Hartford, Connecticut this 21st day of April 2020.**